**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

v.                                                           No. 25-CR-00243-DHU

KYLE MAJEDI,

     Defendant.

**MEMORANDUM OPINION AND ORDER
ON MOTION TO SUPPRESS**

     This matter is before the Court on Defendant's Motion to Suppress Evidence and Supporting Memorandum. Doc. 24. The Government filed its response to Defendant's motion, and Defendant filed his reply. Doc. 29; Doc. 34. The Court held a hearing on the matter on July 23, 2025.

     Having considered the parties' briefs, the evidence of record, hearing testimony, and the applicable law, the Court concludes that Defendant's Opposed Motion to Suppress (Doc. 24) shall be **GRANTED** in part and **DENIED** in part.

**I.
FACTUAL FINDINGS**

     On March 7, 2020, at 11:52 PM, Albuquerque Police Department ("APD") received a 911 call, during which the caller reported that a man was waving a gun outside the caller's front door at an apartment complex located at 3433 Vail Ave SE, Albuquerque, New Mexico. July 23, 2025 Motion Hearing Transcript at 10:12-11:5, 46:20-23, 48:21-25.[1] The caller described the person

---

[1] Hereafter, this Memorandum Opinion and Order cites to the court reporter's unofficial transcript of the Motion Hearing as "Mot. Hr'g Tr. at page:line(s)." Page citations are subject to change on the official, edited version of the transcript.

outside his door as a male in his thirties, weighing 130 pounds and 5'5'' tall, wearing all black. Government's Exhibit 1-1 ("Ex. 1-1") at 00:40-01:10; Ex. 2 at 1. The caller also stated that the person outside his door drove a red Honda Civic with California license plates. Ex. 1-2 at 03:27-03:38; Ex. 2 at 2; Mot. Hr'g Tr. at 13:15-20. APD Detective Anthony Guerrera, assigned to the Albuquerque Southeast area that evening, was dispatched to the location along with Officers Gabriel Sanchez and Jason Chavez. Mot. Hr'g Tr. at 49:18-21; Ex. 2 at 1.

Upon arriving at the scene, the APD officers walked through the parking lot of the apartment complex, as evidenced by Detective Guerrera's body worn camera. Ex. 3 at 01:37.[2] Detective Guerrera first identified and approached a car in the lot that matched the caller's description—a red sedan with a California license plate. *Id.* at 6:14; Mot. Hr'g Tr. at 19:7-17. He then made contact with Defendant Kyle Majedi ("Defendant"), who the Detective believed matched the description the 911 caller had offered to dispatch, as he walked through the parking lot. Ex. 3 at 07:47-08:02. Detective Guerrera stated to Defendant, "Police department, can we see your hands?" to which Defendant responded, "Sorry, wrong person." *Id.* at 07:58-08:02. Detective Guerrera then asked for Defendant's name and Defendant responded "John." *Id.* Detective Guerrera said, "Okay, you're good to go man." *Id.* Detective Guerrera testified that Defendant then moved between two cars towards the red car in the lot with California license plates and reached for the driver's door of the vehicle. Mot. Hr'g Tr. at 23:24-24:12. Officer Sanchez similarly testified that he approached Defendant because he matched the description the caller offered and was seen approaching a red Hyundai with a California plate. *Id.* at 82:25-83:10.

---

[2] The body worn cameras on Detective Guerrera and Officer Sanchez's persons recorded video and audio, which recorded various parts of the interaction including the initial interaction and subsequent search. The recordings are cited as filed by the Government, "Ex. [number]" followed by the minute:seconds displayed on the video recording.

At this point, Detective Guerrera asked Defendant, "Why are you lying to us?" Ex. 3 at 08:26. The officers then instructed Defendant to drop his keys, place his hands on his head, and walk backwards to the sound of Detective Guerrera's voice. *Id.* at 08:30-08:47. During this time, Defendant dropped his backpack on the ground, near the driver's side door of the red sedan. Ex. 3 at 08:38; Ex. 4 at 07:47. Defendant was ordered several times to comply because he was not immediately cooperative with officers' instructions. *Id.*; Mot. Hr'g Tr. at 25:9-14. Defendant then stated that his name was "Sean." Ex. 3 at 09:05; Mot. Hr'g Tr. at 25:22-24. Detective Guerrera told Defendant that this was not what he had said just a few seconds ago. Ex. 3 at 09:06-09:10. Then, Detective Guerrera asked Defendant, "Who is Kyle?" and Defendant stated that he did not know who Kyle was and that Kyle was "over there." *Id.* at 09:15-09:20.

While Detective Guerrera engaged with Defendant, Officer Sanchez placed handcuffs on him. Ex. 4 at 08:19-08:27. Simultaneously, Detective Guerrera asked dispatch whether the 911 caller could confirm if the suspect was bald. Ex. 3 at 09:35; Ex. 2 at 2; Mot. Hr'g Tr. at 83:24-84:2. Less than twenty seconds later, dispatch confirmed that the suspect was bald. Ex. 3 at 09:49. In the time it took to confirm the suspect was bald, Officer Sanchez asked Defendant twice whether he had any weapons on him, and Defendant responded no. Ex. 4 at 08:29, 08:46; Mot. Hr'g Tr. at 84:16-20. Immediately thereafter, Officer Sanchez conducted a pat down search of Defendant and discovered a firearm located on the right-hand side of Defendant's waistband. Ex. 4 at 08:46-09:00; Mot. Hr'g Tr. at 84:21-85:2.

Detective Guerrera then walked over to the caller's apartment, knocked on the door and asked for details about the incident. Ex. 3 at 10:10-10:57. The caller explained that he saw Defendant pace back and forth outside his door with a gun. *Id.* at 11:10-11:20. Detective Guerrera asked if the suspect was "a little bald guy" and the caller confirmed the suspect was bald. *Id.* Then,

the caller explained the suspect kept his handgun on the right-hand side of his waistband and showed the detective where the gun was located. *Id.* at 11:32-11:35.

Detective Guerrera returned to the lot where the Defendant was handcuffed and informed Defendant they were going to walk over and sit on the curb. *Id.* at 11:38-12:15. Unprompted, Defendant began explaining that the caller was jealous of Defendant and his girlfriend. *Id.* at 13:46-13:56. Defendant told Detective Guerrera, "You guys arrest me right outside of my house." *Id.* at 14:03; Mot. Hr'g Tr. at 61:3-5. Defendant continued talking while Detective Guerrera remained silent. Ex. 3 at 14:11-14:23. Detective Guerrera explained that the primary officer would explain everything to Defendant. *Id.* at 14:23. A minute later, Defendant began yelling "Jackie, I love you!" and "Jackie get me out please!" *Id.* at 15:33-15:53. Detective Guerrera and a second officer instructed Defendant to stop and explained that if he did not calm down, there would be additional charges for bothering the residents. *Id.* Defendant paused briefly but then continued yelling. *Id.* at 15:54.

Detective Guerrera informed Defendant he would be placed in the police vehicle. *Id.* at 16:11. Defendant countered that he did not want to get in the car, and officers told Defendant he had no choice because he was being detained. *Id.* at 17:56-18:01. Eventually, Defendant sat in the rear seat of the vehicle and Detective Guerrera and the second officer shut the vehicle door with Defendant inside. *Id.* at 19:02.

During this time, Officer Sanchez spoke with the caller outside his apartment. *See* Ex. 4 at 11:47-17:05. The caller explained he had been dating a girl who lived in a nearby apartment. *Id.* at 11:56-12:00. The caller further explained that the Defendant was her ex-boyfriend, who had been coming by, pounding on the door, waving a gun, and threatening the caller and his girlfriend. *Id.* at 11:56-12:07. According to the caller, this happened the week before as well. *Id.* On the night

4

of Defendant's arrest, the caller claimed he could see through the door's peep hole that Mr. Majedi was walking back and forth outside the door with a gun. *Id.* at 12:22-12:26. The caller later stated that Defendant lived one street down on the corner of Ross and Amherst. *Id.* at 14:11-14:18. He went on to clarify that Mr. Majedi is "not on any of the property leases" and did not live there. *Id.* at 14:28-14:31. Officer Sanchez responded that this was not their biggest concern. *Id.* at 14:33. Officer Sanchez did not speak with Jackie, the girlfriend, because she was asleep. *See id.* at 13:46. He explained to the caller that Mr. Majedi would be arrested for aggravated assault with a deadly weapon before returning to the Defendant and the other officers. *Id.* at 16:35.

Officer Sanchez testified at the hearing on the motion that Defendant was in the police vehicle when he returned from speaking with the caller. Mot. Hr'g Tr. at 88:12-21. The various officers discussed the caller's statements that he saw Defendant pace back and forth with the firearm outside his apartment, as well as the two different identifications they found on Defendant's person. Ex. 3 at 19:19-19:39. Officer Sanchez "made the decision that [he] was going to arrest [the Defendant] for aggravated assault with a deadly weapon…" Mot. Hr'g Tr. at 89:1-3. Officer Sanchez then began searching Defendant's backpack—which was on the trunk of the red sedan—while Defendant was in the police vehicle. *Id.* at 88:22-89:5; Ex. 5 at 00:34. Officer Sanchez testified that he searched the backpack because he needed to document what it contained before it was placed into evidence for safekeeping. Mot. Hr'g Tr. at 89:5-14. At some point during Officer Sanchez's search, he discovered drugs in the backpack, stopped searching, and suggested to another officer that they call narcotics. Ex. 5 at 02:00-02:45; Mot. Hr'g Tr. at 95:14-96:2.

Detective Guerrera and Officer Sanchez testified that officers ran the license plate on the Red Hyundai, which showed that it was registered to Defendant and that there were no wants or warrants related to the vehicle or any indication it was stolen. Mot. Hr'g Tr. at 61:15-62:3, 120:23-

121:11. Detective Guerrera further testified that the vehicle was parked in a parking space in the lot of the apartment complex, not blocking anybody's egress or ingress, and that Defendant had keys to the car, which were placed on the car during his interaction with police. *Id.* at 62:4-10. In addition to Defendant's statement that officers were arresting him outside his house, Ex. 3 at 14:03, Detective Guerrera and Officer Sanchez were also both made aware by dispatch that Defendant had a key to Apartment 3 in the same complex and that Defendant resided or stayed there, Mot. Hr'g Tr. at 53:2-9, 128:14-20.

## II.
## PROCEDURAL BACKGROUND

Defendant was charged with possession with intent to distribute 50 grams and more of methamphetamine; possession with intent to distribute heroin; possessing a firearm in furtherance of a drug trafficking crime; and being a felon in possession of a firearm. Doc. 2. Through his Motion to Suppress Evidence, Defendant now requests the Court suppress all evidence seized by law enforcement officers in the early morning hours of March 8, 2020. Doc. 24.

First, Defendant argues that the officers lacked probable cause to arrest him. Defendant explains that the placing of handcuffs on him and his prolonged detention in the back of a police car for nearly two hours before the caller identified him as the person seen with a firearm was a *de facto* arrest without probable cause. Doc. 24 at 4-5. Therefore, argues Defendant, any evidence seized as a result of that arrest—including any statements Defendant made to police during that time—should be suppressed. *Id.* at 5. Defendant contends that officers had no corroborating information and needed to undertake additional investigation before arresting him. *Id.* Defendant relies on *United States v. Soza*, 686 F. App'x 564 (10th Cir. 2017), to argue that finding a person near the crime who matches the general description of the suspect does not give rise to probable cause. Doc. 24 at 5-6. Accordingly, Defendant argues that any evidentiary items seized or

6

statements obtained during the course of the allegedly unlawful arrest must be suppressed as "fruit of the poisonous tree." *Id.* at 6-7.

Defendant also argues that, even if this Court finds that the officers had probable cause to arrest Defendant, the officers' warrantless search of his backpack was unlawful and that any evidence seized from it must be suppressed. *Id.* at 7. The search of the backpack, according to Defendant, does not fall under the "search incident to arrest" exception to the warrant requirement because the backpack was searched over thirty minutes after he was frisked and handcuffed. By the time the bag was searched, argues Defendant, he no longer had access to it, and it posed no genuine danger to officer safety. *Id.* at 8-9.

In its Response, the United States first argues that officers had reasonable suspicion to frisk and temporarily detain Defendant, and that this did not rise to an arrest. Doc. 29 at 8-10. Next, the Government asserts that the officers had probable cause to arrest Defendant for aggravated assault, as he matched the caller's description, and soon after making contact with him, they discovered a firearm and confirmed that the suspect was bald. *Id.* at 12. Finally, the United States concedes that the search of Defendant's backpack was not a valid search incident to arrest. *Id.* at 16. However, the Government argues the exclusionary rule should not apply here because the evidence would have inevitably been discovered during a subsequent proper inventory search. *Id.* at 17.

Defendant submitted a Reply in support of his motion, reiterating the argument that his detention amounted to a *de facto* arrest lacking probable cause. Doc. 34 at 1. Defendant also argues that the inevitable discovery rule does not apply in this case, because an inventory search of the backpack would only be lawful if officers had legitimate custody of Mr. Majedi's bag. *Id.* at 4. Defendant cites *United States v. Sanders*, 796 F.3d 1241 (10th Cir. 2015), which analyzes the constitutionality of vehicle impoundments, to argue that the impoundment and subsequent

inventory search that the Government claims would have inevitably led to the lawful discovery of narcotics was not, in fact, lawful. Doc. 34 at 5-8. Alternatively, the Defendant argues that the purported inventory search itself was unlawful. *Id.* at 9.

A hearing was held in this matter on July 23, 2025. At the hearing, the Court heard testimony from Detective Anthony Guerrera and Officer Gabriel Sanchez, APD officers who responded to the March 7, 2020, 911 call at issue in this case, as well as from the Defendant, Kyle Majedi. After the witness testimony, the parties presented their arguments and responded to questions from the Court. The Government seemed to acknowledge that Defendant was under arrest—not just detained—when he was handcuffed by officers after he approached the red Hyundai sedan, but argued that probable cause existed at that time. Mot. Hr'g Tr. at 198:16-23, 199:15-21. Most of the argument, however, was focused on the applicability of the *Sanders* factors to personal property, and if applied, whether the impoundment of the backpack was lawful such that the backpack's contents would inevitably be discovered through an inventory search. The Defendant argued that impoundment of both the backpack and the car was unlawful because they were located on private property outside Mr. Majedi's residence. *Id.* at 163:9-164:25. The Government argued that officers did not have credible evidence that Mr. Majedi resided in Apartment 3. *Id.* at 180:17-23, 183:20-184:16.

## III.
## LEGAL STANDARDS

The Fourth Amendment protects "[t]he right of the people to be secure . . . against unreasonable searches and seizures." U.S. Const. amend. IV. The purpose of the Amendment "is to safeguard the privacy and security of individuals against arbitrary invasion by governmental officials." *Carpenter v. United States*, 585 U.S. 296, 303 (2018). To that end, "the ultimate touchstone of the Fourth Amendment is reasonableness." *Brigham City v. Stuart*, 547 U.S. 398,

403 (2006) (internal quotations omitted). Courts determine the reasonableness of a search "by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *Samson v. California*, 547 U.S. 843, 848 (2006) (quoting *United States v. Knights*, 534 U.S. 112, 118-19 (2001)). "Searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967). "These exceptions include, among others, searches incident to arrest, searches and seizures justified by a noninvestigatory community-caretaking rationale, and searches conducted for administrative inventory purposes." *United States v. Braxton*, 61 F.4th 830, 833 (10th Cir. 2023).

Seizure of a person occurs "when [an] officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen[.]" *Terry v. Ohio*, 392 U.S. 1, 19 n. 16 (1968); *see also Torres v. Madrid*, 592 U.S. 306, 312 (2021) ("The 'seizure' of a 'person' plainly refers to an arrest."). A warrantless arrest by law enforcement is reasonable under the Fourth Amendment when there is probable cause to believe a criminal offense has been or is being committed. *Devenpeck v. Alford,* 543 U.S. 146, 152 (2004). The United States bears the burden of proof to justify warrantless searches and seizures. *United States v. Zubia-Melendez*, 263 F.3d 1155, 1160 (10th Cir. 2001).

Evidence obtained from a warrantless search or seizure without an applicable exception is unconstitutional under the Fourth Amendment and is inadmissible under the exclusionary rule. *United States v. Neugin*, 958 F.3d 924, 931 (10th Cir. 2020). However, the inevitable discovery doctrine allows the evidence to be admitted if it would have "inevitably [] been discovered by lawful means." *United States v. Souza*, 223 F.3d 1197, 1202 (10th Cir. 2000). "[T]he government

has the burden of proving by a preponderance of the evidence that the evidence in question would have been discovered in the absence of the Fourth Amendment violation." *Neugin*, 958 F.3d at 932 (citation omitted).

## III.
## DISCUSSION

### A.  The officers had, or quickly developed, probable cause to arrest Defendant.

An officer may arrest an individual without a warrant if they have probable cause to believe a crime has been committed by the arrestee. *See Devenpeck*, 543 U.S. at 152. "Probable cause to arrest exists only when the facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." *United States v. Valenzuela*, 365 F.3d 892, 896 (10th Cir. 2004) (internal quotation and citation omitted). "Probable cause to arrest does not require facts sufficient to establish guilt, but does require more than mere suspicion." *United States v. Muñoz-Nava*, 524 F.3d 1137, 1144 (10th Cir. 2008) (quoting *United States v. Vazquez-Pulido*, 155 F.3d 1213, 1216 (10th Cir. 1998)).

In his Motion to Suppress, Defendant argues that the APD officers' placement of handcuffs on him and his prolonged detention in the back of a police car constituted an unlawful arrest unsupported by probable cause. Doc. 24 at 5. He analogizes his case to *United States v. Soza*, where the Tenth Circuit held that brandishing firearms and handcuffing an otherwise compliant suspect not known to be armed transformed an otherwise lawful *Terry* stop[3] into a warrantless arrest. *Id.*

---

[3] In *Terry v. Ohio*, the Supreme Court held that a limited search of a person's outer clothing in an attempt to discover weapons is reasonable under the Fourth Amendment where the officer has reasonable suspicion that "criminal activity may be afoot" and that the suspect might be "armed and presently dangerous." 392 U.S. 1, 30-31 (1968). Such a search is colloquially known as a *Terry* stop or a "stop and frisk." Defendant's motion does not argue that the APD officers who responded to the scene on March 7, 2020 lacked reasonable suspicion to stop and frisk Mr. Majedi.

at 5-6 (citing *Soza*, 686 F. App'x at 567-68). The *Soza* Court explained that, under the facts of that case, the defendant's resemblance to a general description of the suspect and close proximity to the crime scene was insufficient to establish probable cause. 686 F. App'x at 567. As discussed below, although the Government now concedes the Defendant was under arrest once he was restrained, the Court determines that Mr. Majedi's case is distinct from *Soza* in several respects and finds the APD officers had probable cause to arrest Mr. Majedi.[4]

In *Soza*, the Tenth Circuit held that officers lacked probable cause when they unholstered their guns and handcuffed the defendant with only the knowledge that he matched a general description of an unidentified burglar and was in close proximity in time and place to the burglary.

---

[4] The Court recognizes that under Tenth Circuit law, the use of firearms, handcuffs, or other forceful techniques can, but does not necessarily, transform a *Terry* detention into a full custodial arrest. *See Soza*, 686 F. App'x at 567 (citing *United States v. Melendez-Garcia*, 28 F.3d 1046, 1052 (10th Cir. 1994)). Generally, to remain within the scope of an investigative detention, the Government must show that use of such techniques was "reasonably necessary to protect [officers'] personal safety and to maintain the status quo during the course of the stop." *United States v. Mosley*, 743 F.3d 1317, 1329 (10th Cir. 2014).

In this case, based on the report from the 911 caller, the officers at the scene had reason to believe that Defendant was armed with a gun, not just that he "could potentially be violent," which was the case for the defendant in *Soza* who had allegedly thrown a rock through a window. *Id*. at 569. In addition, unlike the defendant in *Soza*, Mr. Majedi did not immediately comply with officers' questioning and requests. Ex. 3 at 08:30-08:55; Mot. Hr'g Tr. at 25:21-25, 26:1-4. In *Soza*, the Tenth Circuit found that the defendant's calm demeanor upon being approached by officers took precedence over the uncertain possibility that he would be violent, making it unreasonable to brandish their firearms and use handcuffs. 686 F. App'x at 569. By contrast, Defendant in this case lied to officers immediately. He stated they had the wrong guy, and that his name was John. Ex. 3 at 07:58-08:02. Once officers saw him approach the only red car with California plates in the area, they asked him to stop, drop his keys, and get on his knees. *Id*. at 08:30-08:55. Defendant did not immediately comply. Instead, he lied again by stating his name was "Sean" and that Kyle was "over there." *Id*. at 08:40-09:20.

This case more closely resembles *United States v. Paetsch*, cited in *Soza*, where the Tenth Circuit upheld the brandishing of firearms and use of handcuffs on a suspect during a *Terry* stop because the officers knew the suspect was armed and observed the defendant acting suspicious and refusing to comply with officer commands. *See* 782 F.3d 1162, 1175 (10th Cir. 2015).

686 F. App'x at 567. Here, the officers who detained Defendant had more specific information than the officers in *Soza*. The caller in this case described the suspect as a white male, possibly mid-thirties, 5'5", wearing black[5] and weighing around 130 pounds. Ex. 1-1 at 00:40-01:10. The caller stated Defendant had tattoos on his face and carried a backpack. Ex. 1-2 at 04:58-05:19. The caller also stated that the Defendant drove a red Honda Civic with a California license plate. *Id.* at 03:27-03:38. This description is far more detailed than the description at issue in *Soza*—that the suspect was an adult Hispanic male wearing a baseball cap and a grey sweatshirt. 686 F. App'x at 565-66. In fact, officers testified that they only observed one vehicle matching the description offered by the caller—a red sedan[6] with California plates in the parking lot of the apartment complex. *See* Mot. Hr'g Tr. at 19:7-20:15.

Moreover, when officers first encountered Defendant, who matched the caller's general description, they did not immediately apprehend him, as they did in *Soza*. Instead, the officers identified themselves as police, asked him to "come over here," and asked for his name. Ex. 3 at 07:46-08:02. Defendant responded, "Sorry, wrong person" and stated his name was "John," at which point the officer said, "You're good to go man." *Id.* Officers only approached Defendant again with guns drawn when he approached the only vehicle in the parking lot matching the caller's description. *Id.* at 08:20. Whereas it was reasonably likely in *Soza* that officers could happen upon

---

[5] The Court does not find it significant that the caller stated the individual with the firearm was wearing black, and Defendant was observed by the officers wearing a dark blue sweatshirt. As the Court noted at the hearing, the discrepancy was likely not due to the officers identifying the wrong person, but rather that the caller was looking through a peephole in his door at the individual late at night. Mot. Hr'g Tr. at 159:17-24. It was not unreasonable for the officers to believe the individual's clothing matched that described by the caller.

[6] The caller described the car as a Honda, but the car officers approached was a Hyundai. Detective Guerrera testified that in his experience, people have mixed up Hondas and Hyundai, and the Court agrees that these cars might reasonably be confused for one another.

multiple Hispanic males in the area that afternoon wearing a hat and a grey sweatshirt, the description of the suspect in this case, including his connection to a red sedan, seems unlikely to have pointed officers to any other person in the area, especially given the time of day and officers' observation of just one vehicle matching the caller's description in the lot. These facts yield a much higher probability that someone approaching the red sedan and otherwise matching the caller's physical description was the perpetrator. *See, e.g., Chambers v. Maroney*, 399 U.S. 42, 44, 46 (1970) (finding probable cause existed where suspects matched the specific description of four men in a light blue compact station wagon, one of whom was wearing a green sweater and one of whom was wearing a trench coat); *United States v. Miller*, 532 F.2d 1335, 1337-38 (10th Cir. 1976) (finding officers had probable cause to arrest defendants based on a match to the car and license plates known by police and victims).

Immediately upon frisking Mr. Majedi, officers discovered additional information that connected him to the reported crime, justifying his detention at the scene and eventual arrest. First, officers located a firearm on Mr. Majedi's person, matching the 911 caller's report that the suspect was wielding a pistol and waiving it around. Ex. 4 at 08:46-09:00; Mot. Hr'g Tr. at 26:13-20, 84:21-85:2. Around this same time, it was also confirmed by dispatch that the suspect the 911 caller described was bald, which matched officers' observations of Mr. Majedi. Ex. 3 at 09:49. Officers also located identification from two different states, suggesting again that the Defendant had not been truthful about his identity when asked by officers. *Id.* at 19:31-38. These additional facts, paired with Defendant's match to the caller's physical description *and* Defendant's approach of the only red sedan with California plates in the area, further corroborated the caller's report and were sufficient to transform officers' "mere suspicion" into a reasonable belief that Mr. Majedi

13

was the person who committed the reported offense. This represents the probable cause required to arrest Defendant without a warrant.

**B. Evidence seized from Defendant's backpack is not admissible under the inevitable discovery doctrine.**

The Court must next determine whether the narcotics discovered in Defendant's backpack would have been inevitably discovered through a lawful inventory search, even though the underlying search violated the Fourth Amendment. *See United States v. Souza*, 223 F.3d 1197, 1202 (10th Cir. 2000). The Government concedes that the search of Defendant's backpack at the scene was not a valid search incident to arrest. Doc. 29 at 16. Defendant had been arrested, handcuffed, placed in the back of the police vehicle, and was nowhere near his backpack when it was searched. *Id.* However, the Government argues that the evidence would have been discovered anyway through a lawful inventory search of the backpack. *Id.* at 17-18. Defendant disagrees, arguing that the inevitable discovery doctrine does not apply in this case because Defendant's backpack was not lawfully impounded, or in the alternative, the inventory search itself was unlawful. Doc. 34 at 4-9.

1. Defendant's backpack could not have been lawfully impounded.

Defendant first argues that his backpack could not have been subject to a lawful inventory search because it was not lawfully in the custody of APD. This requires the Court to analyze whether officers' decision to impound Defendant's backpack was lawful in the first place.

In the Tenth Circuit, *United States v. Sanders* provides a framework for analyzing the police-ordered impoundment of vehicles. *See* 796 F.3d at 1241. Although the issue in this case centers on the impoundment of Defendant's backpack, not his car, the "[p]rinciples from these vehicle-impoundment cases are relevant in the context of personal property." *United States v. Braxton*, 61 F.4th 830, 834 (10th Cir. 2023) (applying *Sanders* to analyze whether a backpack

could have been lawfully impounded); *see also United States v. Veale*, 734 F.Supp.3d 1169, 1176 (D.N.M. 2024) (applying *Sanders* and its progeny to analyze police-ordered impoundment of a defendant's bags); *United States v. Knapp*, 2019 WL 11502454, at *3 (D. Wyo. June 13, 2019) (applying *Sanders* to analyze the impoundment of a purse after noting that cases involving personal effects "are analyzed similarly" to vehicle impoundment cases). The Court therefore relies on the *Sanders* framework to guide its determination of whether APD could have lawfully impounded Defendant's backpack.

The Government bears the burden of proving that its impoundment of a vehicle satisfies the Fourth Amendment. *United States v. Ibarra*, 955 F.2d 1405, 1409 (10th Cir. 1992). *Sanders* articulates a two-part inquiry for assessing the constitutionality of a police-ordered impoundment when a vehicle is on private property and is "neither obstructing traffic nor creating an imminent threat to public safety." 796 F.3d at 1248. First, a court must ask whether such an impoundment is guided by standardized policy; and second, whether impoundment is justified by a "reasonable, non-pretextual community-caretaking rationale." *Id.* Under *Sanders*, the impoundment of a vehicle from private property is constitutional only "if guided by *both* standardized criteria and a legitimate community-caretaking rationale." *Id.* at 1243 (emphasis added).

a. *Standardized Criteria*

The requirement that impoundments be guided by standardized criteria ensures that police discretion in this area is cabined, rather than uncontrolled. *Id.* at 1249. In the absence of standardized criteria, police impoundment of a vehicle or other object not impeding traffic or otherwise threatening public safety cannot be lawful, even if the community-caretaking factors weigh in favor of impoundment. *See id.* at 1250. At the hearing in this matter, the Government emphasized that Defendant's car, and therefore his backpack, were impounded pursuant to APD's

standard operating procedures with respect to towing. Mot. Hr'g Tr. at 173:22-24. In other words, the Government contends that Defendant's backpack would have been placed in his car, which in turn, APD would have towed pursuant to their standard operating procedures. *Id.* at 173:22-174:24.

APD Procedural Order 2-48 ("SOP 2-48"), operative at the time of Mr. Majedi's arrest, outlines the various circumstances under which police will tow a vehicle. To justify APD's decision to tow Defendant's car, the Government points to one specific provision stating that vehicles will be towed when "[t]he driver has been incapacitated, hospitalized, *arrested*, or when the vehicle cannot be released to a responsible party." Ex. 9 (emphasis added). The Order goes on to clarify that "[o]fficers *will not* tow if the vehicle is parked at the driver's *place of residence*, or his/her registered address." *Id.* (emphasis added).

Reliance on SOP 2-48 fails for two independent reasons. First, SOP 2-48 does not address the impoundment of personal property. It does not discuss, and the Government has not provided evidence of, any standardized criteria for taking an individual's personal property into custody, either on its own or by placing it inside a vehicle to be towed. At the hearing in this matter, the Government suggested there are standardized operating procedures regarding the impoundment of personal property, Mot. Hr'g Tr. at 182:4-8, but evidence of these procedures was not provided during or after the hearing. This suggests that impoundment of the *backpack*, independent of the car, was not and could not have been done according to standardized criteria.

Second, even if the Court assumes that SOP 2-48 applies to personal property or accepts the argument that officers could and would have placed the backpack in Defendant's car pursuant to another standardized policy, the Government runs into another problem. SOP 2-48 says that officers will not tow a vehicle from an individual's residence. The burden is on the Government to prove the legality of an impoundment, and here, they have not offered sufficient evidence that

officers' decision to tow Mr. Majedi's car was guided by the standardized criteria in SOP 2-48. Specifically, the Government has not shown that officers meaningfully attempted to ascertain where Mr. Majedi lived to ensure they did not impound the backpack or tow the car from his place of residence.

In fact, the information available to officers at the time of Mr. Majedi's arrest suggests that he may have resided in Apartment 3 of the apartment complex. In the lapel video showing Defendant's interactions with police on the night of his arrest, he tells one officer, "You guys arrest me right outside of my house." Ex. 3 at 14:03. At the hearing, Defendant testified that he resided in Apartment 3 of the complex, in addition to having another apartment a few blocks away. Mot. Hr'g Tr. at 146:15-23. He testified that he paid rent, had a key, and kept his personal items in Apartment 3. *Id.* at 147:2-16. Detective Guerrera testified that he was not aware at any time during the investigation where Defendant lived, though he admitted he was aware that Defendant had a key to Apartment 3. *Id.* at 53:2-9. And during his testimony, Officer Sanchez admitted that officers were made aware by the Defendant that Apartment 3 was his residence. *Id.* at 128:10-20. Despite some evidence undercutting Defendant's credibility, including statements by the 911 caller that Mr. Majedi lived one street away, Ex. 4 at 14:11, the evidence does not indicate that officers undertook further investigation as to Defendant's place of residence. They did not talk to Jackie, who both the caller and Mr. Majedi claimed to be dating, and Officer Sanchez indicated when talking with the caller that exactly where Defendant lived was "not [his] biggest concern." Ex. 4 at 14:33.

It is the United States' burden to show it was reasonable for officers to believe Mr. Majedi did *not* reside at the apartment complex where he was arrested, and the Court finds that the Government has not met this burden. This means that officers' decision to tow Defendant's vehicle

was not done in accordance with SOP 2-48. Accordingly, impoundment of the backpack cannot be justified on its own or by impoundment of the vehicle under the standardized criteria submitted by the Government.

In addition to SOP 2-48, the Government claims that officers were guided by an unwritten policy, supported by field training, to impound cars and other items from the scene of a domestic violence call to reduce the likelihood the individual will return to the scene and cause a future altercation. *See* Mot. Hr'g Tr. at 40:23-41:14, 130:22-131:11. However, beyond vague officer testimony that this was a policy implemented through field training, the Government does not offer additional evidence of this policy, nor did the officers' testimony outline any standardized criteria for determining when and how to apply such a rule. Beyond this, if Mr. Majedi did, in fact, reside at the apartment complex, then this unwritten policy is likely superseded by the written policy prohibiting the impoundment of vehicles outside the driver's residence.

On balance, the evidence before the Court suggests that officers were not guided by standardized criteria in deciding to impound Defendant's backpack—or his car. This finding alone defeats the possibility that either the backpack or the vehicle could have been lawfully impounded under these circumstances.

b.  *Reasonable, Non-Pretextual Community Caretaking Rationale*

Even if the officers had reason to believe the apartment complex was not Mr. Majedi's residence, and therefore the impoundment of the backpack and car were done in accordance with standardized criteria, the legality of impoundment independently fails upon consideration of *Sanders*' second prong. *See* 796 F.3d at 1250 ("Protection against unreasonable impoundments, even those conducted pursuant to standardized policy, is part and parcel of the Fourth Amendment's guarantee against unreasonable searches and seizures.") (citation omitted); *see also*

*United States v. Venezia*, 995 F.3d 1170, 1182 (10th Cir. 2021) (finding that, despite officers' attempt to impound a vehicle in accordance with standardized policy, the impoundment was still unlawful because it failed *Sanders*' second prong). The second prong of *Sanders* requires impoundments to be justified by a "reasonable, non-pretextual community-caretaking rationale." *Sanders*, 796 F.3d at 1248. The *Sanders* Court identified a set of non-exclusive factors to guide analysis of this prong, which includes:

> (1) whether the vehicle is on public or private property; (2) if on private property, whether the property owner has been consulted; (3) whether an alternative to impoundment exists (especially another person capable of driving the vehicle); (4) whether the vehicle is implicated in a crime; and (5) whether the vehicle's owner and/or driver have consented to the impoundment.

*Id.* at 1250.

"[P]ublic safety and convenience are less likely to be at risk when a vehicle is located on private property. That risk is particularly diminished when the private property owner does not object to the vehicle's presence." *See Venezia*, 995 F.3d at 1179. For this reason, impoundment of a vehicle located on private property, particularly when the owner of the property has not been consulted, is less likely to be reasonable. *See id.* at 1178-79. The first factor weighs against the reasonableness of impoundment in this case because Mr. Majedi's backpack was located on private property—that is, the parking lot of a private apartment complex. Mot. Hr'g Tr. at 43:6-7, 97:24-98:1. It does not matter whether the backpack was located on Defendant's property. *See United States v. Ramos*, 88 F.4th 862, 874 (10th Cir. 2023) ("To be clear . . . this factor asks whether impoundment was undertaken from private property, not from the vehicle owner's property.").

The second factor likewise weighs against impoundment because the owner of the apartment complex was not consulted. Community caretaking interests may permit officers to impound property that interferes with a private property owner's use of their property, but Tenth Circuit precedent makes clear that "this decision is left up to the property owner, not the police."

*Id.* at 876. Guesses about a property owner's preferences, even if they turn out to be correct, are not sufficient to carry this factor. *Id.* at 877 (citing *United States v. Woodard*, 5 F.4th 1148, 1156 (10th Cir. 2021) (explaining that lack of evidence in the record that police consulted property owners about a vehicle points to pretext)). At the hearing, both officers testified that they did not attempt to call the apartment complex management to ask what they wanted to do with Mr. Majedi's backpack or car. Mot. Hr'g Tr. at 43:9-11, 66:13-17, 116:22-117:3. Irrespective of the late hour or officers' sense of the risks inherent in leaving the backpack and car at the apartment complex overnight, their failure to consult the property owner weighs against a finding that the impoundment was reasonable.

The third factor is a closer call. "Where an alternative to impoundment does not threaten public safety or convenience, impoundment is less likely to be justified by a community-caretaking rationale." *Venezia*, 995 F.3d at 1179. This case certainly does not present as strong of an alternative as those situations where another person was on-site or nearby and offered to retrieve the property as an alternative to impoundment. *See, e.g., Ramos*, 88 F.4th at 877 (finding a reasonable alternative to impoundment existed when the owner of the vehicle at issue lived a few blocks away and was available to retrieve the vehicle); *Knapp*, 2019 WL 11502454, at *3 (finding alternative to impoundment existed when the defendant's friend was present for the arrest and agreed to take possession of the purse at issue and lock it in the car defendant was driving). Nevertheless, two possible alternatives existed to impounding Defendant's backpack in this case. First and most obviously, the backpack could have been placed in Mr. Majedi's car. Officers ran a search of the license plates on Defendant's car, confirming that the car was registered to him and that there were no wants or warrants on the vehicle. Mot. Hr'g Tr. at 61:15-62:3, 120:23-121:13. However, Defendant's car was also towed from the apartment complex on the night of his arrest. *Id.* at 31:23-

25. The Government argues that under this alternative, the backpack would nevertheless have been inventoried as part of a lawful inventory of the car. *Id.* at 186:14-187:9. Whether this argument has merit depends upon whether police lawfully impounded Defendant's car. This issue is analyzed below in subsection B(2).

The second alternative to impounding the backpack was to place it in Apartment 3, where Mr. Majedi claims he resided. *See id.* at 146:15-23. Both officers acknowledged that they were made aware during their investigation that Defendant had a key to Apartment 3. *Id.* at 53:2-9, 117:19-120:3. The Court recognizes that the information available to officers the night of Mr. Majedi's arrest may have suggested that Apartment 3 was not an appropriate alternative. *See id.* at 41:3-14 (explaining that given the violent nature of the allegation, officers would tow the car—and impound other items—to ensure the Defendant would not return to the location and possibly engage in another confrontation), 92:7-93:9 (explaining the same with respect to the decision to tow Defendant's vehicle); *see also id.* at 41:15-17 (indicating uncertainty about where Defendant lived), 93:10-13 (testifying that the caller stated Defendant lived down the street). However, in line with the Court's discussion above regarding the officers' minimal attempts to ascertain Defendant's place of residence, there is no evidence that officers even considered the possibility that Mr. Majedi's backpack could be placed in Apartment 3[7]—a unit he seemingly walked out of, to which he had a key, and which he called his "house" during the course of his initial detention. *See id.* at

---

[7] Some Tenth Circuit precedent suggests that officers do not have a duty to allow a Defendant to call someone to retrieve their property in order to avoid impoundment. *See, e.g., United States v. Trujillo*, 993 F.3d 859, 870 (10th Cir. 2021). This same idea could extend to officers' duty (or lack thereof) to affirmatively explore the existence of other alternatives, like placing the property in a nearby apartment. However, in *Woodard*, the Tenth Circuit clarified that the scope of officers' duties in situations like the one at issue in this case "has nothing to do with the third pretext factor, which addresses the existence of alternatives to impoundment." 5 F.4th at 1157. "Regardless of whether the police have a duty to let someone else pick up or move a car," or explore additional alternatives to impoundment, "the police either have alternatives or they don't." *Id.*

60:22-61:8, 117:19-120:3; *see also* Ex. 3 at 14:03. Moreover, concerns about the Defendant returning to the apartment are somewhat irrelevant if that was, in fact, his residence, as Defendant would most likely return to the complex irrespective of whether his property was left there. Because the Court concluded above, in Section III[B](1)(a), that Defendant likely did reside in Apartment 3, placing the backpack in the apartment was a viable alternative and weighs against impoundment. The alternative of placing the backpack in Defendant's car also weighs against impoundment—but only if the car itself could not have been lawfully impounded.

Turning to the fourth *Sanders* factor, impoundment is warranted "where the [property] is itself evidence of crime." *United States v. Maher*, 919 F.2d 1482, 1487 (10th Cir. 1990). Mr. Majedi's backpack was not implicated in a crime. As Defendant points out in his reply brief and Detective Guerrera acknowledges in his testimony, officers had already arrested Mr. Majedi and seized a handgun from his waistband—the only item relevant to the crime officers were investigating that night. Doc. 34 at 8; Mot. Hr'g Tr. at 63:5-10. Officer Sanchez also admitted at the hearing that officers had no information suggesting that Defendant's backpack was implicated in any criminal activity. Mot. Hr'g Tr. at 107:10-22. "There was no other evidence that the bag had any connection to the purpose for the police call or Mr. Majedi's arrest." Doc. 34 at 8. Therefore, consideration of this factor weighs against a reasonable impoundment.

The fifth factor identified in *Sanders* asks whether the vehicle's owner or driver consented to the impoundment. This, too, favors the Defendant because he was not consulted about what should happen to his backpack or his car. Mot. Hr'g Tr. at 62:18-24, 129:24-130:3. Therefore, he could not have consented to the impoundment of either piece of property.

Even while acknowledging some difficulty in determining the reasonableness of alternatives to impoundment, each of the five *Sanders* factors weighs against the reasonableness

of a community-caretaking-based impoundment of Defendant's backpack. The Government seems to acknowledge this. In support of the impoundment, the Government does not argue that the *Sanders* factors favor impoundment, but rather that the five factors represent a non-exclusive and non-binding list for the Court to consider. *See id.* at 173:11-22. The Government then argues, broadly, that the impoundment of the vehicle—and by extension, the backpack—was done pursuant to standardized operating procedures and non-pretextual community caretaking functions. *Id.* at 173:14-17. Beyond these generalized statements and a reliance on common sense arguments, *id.* at 174:9-24, the Government does not offer additional specific factors the Court should consider that would justify impoundment of Defendant's car or backpack. Without more, the Government has not met its burden that impoundment of the backpack in this case would be reasonable under the Fourth Amendment.

2. <u>Defendant's car could not have been lawfully impounded.</u>

Absent the lawful impoundment of Defendant's backpack on its own, the inevitable discovery doctrine may still apply if Defendant's car was lawfully impounded. In other words, assuming the most obvious alternative to impounding the backpack was to place it in Defendant's car, the Government's argument is that the backpack's contents would have been inventoried anyway as part of a lawful impoundment and inventory search of the vehicle. *Id.* at 186:6-187:9. However, this argument also fails because officers did not lawfully tow Defendant's car. Accordingly, Defendant's backpack could not have been lawfully impounded and searched.

The same legal standard, articulated in *Sanders*, applies to Defendant's car as it does to his backpack. And many of the facts remain the same. Whether the decision to tow the car was guided by standardized criteria depends upon whether it was reasonable for officers to believe the apartment complex was not Mr. Majedi's residence. As discussed above, officers' ignorance of

facts suggesting that Defendant lived in Apartment 3, and their failure to investigate further into Defendant's residence, suggests the car was not towed in accordance with SOP 2-48. *See* Section III[B](1)(a). Even if it was, the impoundment of the vehicle fails anyway when considering *Sanders*' second prong.

Like the backpack, Defendant's car was located on private property—and was not obstructing traffic. Mot. Hr'g Tr. at 62:4-7. This weighs against the reasonableness of the car's impoundment. And as the Court has already discussed, the owner of the apartment complex was not consulted regarding whether the backpack *or* the vehicle should be impounded. *See* Section III[B](1)(b). This, too, weighs against impoundment.

As to the third *Sanders* factor, the most obvious alternative to towing the car was to leave it where it was—parked in a parking spot in the lot of the apartment complex. The Government suggests this alternative is not reasonable for two reasons. First, officers testified that Defendant's property is the responsibility of the police department after an arrest, and leaving the car where it was might heighten the risk of the car being damaged or stolen. *See* Mot. Hr'g Tr. at 42:6-43:1, 90:17-91:7. However, the Tenth Circuit has expressed skepticism about this type of justification when officers knew the owner of the car, had no reason to believe it would be abandoned, and failed to consider other alternatives to impoundment. *See, e.g., Venezia*, 995 F.3d at 1180-81 (finding that leaving a car overnight in a motel parking lot, even in a "high-crime area," was not so unusual as to imminently risk theft or vandalism or otherwise threaten public safety); *cf. United States v. Kornegay*, 885 F.2d 713, 716 (10th Cir. 1989) (justifying impoundment under a community-caretaking rationale when law enforcement arrested a person whose real identity they did not know, who had no friends or relatives to take the car, involving a car whose registration and owner was not known, parked outside a business open to the public where a car parked

overnight might draw attention). There is certainly nothing unusual about a car parked overnight—or longer—at a private apartment complex, especially if the car was regularly seen there. The Defendant's car therefore was no more likely to be stolen or damaged than were the cars of other residents parked around him. Accordingly, the Government's suggestion that leaving the car there presented an issue regarding the safety and security of Defendant's car carries little weight.

Second, because of the nature of the crime alleged, officers testified they towed the car, in part, to prevent the Defendant from returning to the scene at a later time. Mot. Hr'g Tr. at 40:23-41:11, 92:7-93:9; *see also id.* at 188:16-189:13 (arguing the same). But as discussed above, this second consideration is irrelevant given the evidence that Defendant resided at this apartment complex and would be returning regardless. *See* Section III[B][1](a). This factor therefore weighs against impoundment because leaving the car where it was would have been a reasonable alternative.

The car itself was not implicated in any crime, so the fourth *Sanders* factor does not favor impoundment either. As discussed above, officers had already located a firearm on Defendant's person, the only item relevant to the alleged crime. *See* Section III[B][1](b); *see also* Mot. Hr'g Tr. at 107:10-108:12. Finally, *Sanders*' fifth factor counsels against impoundment as well, since Mr. Majedi did not consent to the impoundment of his car.

Taken together, for many of the same reasons that the impoundment of Mr. Majedi's backpack could not have been lawful, the decision by APD to tow Defendant's vehicle was not reasonable under *Sanders* and therefore violated the Fourth Amendment. This finding forecloses the possibility that the contents of Mr. Majedi's backpack could have been lawfully discovered via an inventory search of his car.

3.  <u>The Court need not analyze the legality of a hypothetical inventory search of Defendant's backpack.</u>

While conceding that officers' search of Defendant's backpack at the scene was not lawful, the Government argues that the contents of Mr. Majedi's backpack would have inevitably been discovered through a valid inventory search. Doc. 29 at 16-18. An inventory search is a well-defined exception to the Fourth Amendment's warrant requirement and serves three purposes: to protect the owner's property, to protect police against claims of lost or stolen property, and to protect police from potential danger. *United States v. Haro-Salcedo*, 107 F.3d 769, 772 (10th Cir. 1997) (citations omitted). However, "no inventory of the contents of [Defendant's bag] could have been conducted but for the unlawful impoundment of the [bag]." *United States v. Ibarra*, 955 F.2d 1405, 1410 (10th Cir. 1992). Because the Court has already found that Defendant's backpack could not have been lawfully impounded, the Government's inevitable discovery argument must fail.

# IV.
# CONCLUSION

For the reasons stated above, the Court will suppress the physical evidence obtained from Defendant's backpack on the night of his arrest. Based on the facts determined by the Court, officers did not lawfully search Defendant's backpack at the scene, and the contents of the backpack would not have been inevitably discovered because the bag was not—and could not have been—lawfully in APD's custody. The Court also finds that officers' decision to stop and frisk Mr. Majedi on the night of his arrest was supported by reasonable suspicion, and their search of his person—where they located a firearm—gave rise to probable cause to arrest him for the crime alleged, when combined with the totality of information known to the officers at the time. The Court therefore **GRANTS** Defendant's motion to suppress with respect to any evidence discovered

in his backpack but **DENIES** Defendant's motion with respect to any other evidence obtained and

statements made incident to his detention and arrest.

   **IT IS SO ORDERED.**

_____

HONORABLE DAVID HERRERA URIAS
UNITED STATES DISTRICT JUDGE